**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

- v. -                                                    No. 1:20-cr-00380-PAC

CHARLES EVANS,

Defendant.

**SENTENCING MEMORANDUM ON BEHALF OF CHARLES EVANS**

Gregory Morvillo
**MORVILLO PLLC**
90 Broad St
New York NY 10004
646-831-1531

E. Scott Morvillo
**Stroock & Stroock & Lavan LLP**
180 Maiden Lane
New York, NY 10038
Tel.: 212-806-5425

*Attorneys for Defendant Charles Evans*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ........................................................... 2

 I.  Charles' Personal Background.................................................................. 2

   A.  Charles' Childhood and Youth ................................................. 2

   B.  Charles is Arrested for Robbery at 16 Years Old ...................... 5

   C.  The Coercion Charge ................................................................ 6

   D.  Zion and Charles' Family Circumstances................................. 8

   E.  Charles' Relationship With His Father..................................... 9

   F.  Charles is Released on Parole and Immediately Obtains a Job ................. 10

   G.  Charles Becomes a Father........................................................ 10

   H.  Charles Obtains a Job at Butler Painting ................................. 11

   I.  Charles' Relationship With Family After His Release ............. 12

 II.  Relevant Facts Concerning the Offense Conduct ................................... 13

SENTENCING ANALYSIS................................................................................................ 15

 I.  The Guidelines Calculation.................................................................... 16

   A.  The Applicable Offense Level and Criminal History Category Under the Guidelines .................................................................. 16

 II.  Factors to be Considered Under 18 U.S.C. §3553(a) ........................... 17

   A.  Mr. Evans' Personal History and Characteristics ..................... 18

    i.  Mr. Evans' Family Circumstances Warrant a Non-Guidelines Sentence.............................................. 18

   B.  COVID-19 Conditions at Rikers Island, Essex County Correctional Facility, and the Metropolitan Detention Center Warrant Leniency ......... 20

   C.  Mr. Evans' Criminal History Category Overstates the Seriousness of his Criminal History .................................................................. 26

   D.  Mr. Evans' Efforts at Post-Offense Rehabilitation .................... 28

   E.  General and Specific Deterrence ............................................... 30

CONCLUSION.................................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007).................................................................................................17, 18

*Kimbrough v. United States*,
    552 U.S. 85 (2007)......................................................................................................15

*Koon v. United States*,
    518 U.S. 81 (1996)......................................................................................................16

*Pepper v. United States*,
    562 U.S. 476 (2011)....................................................................................................16

*Simon v. United States*,
    361 F. Supp. 2d 35 (E.D.N.Y. 2005) .........................................................................15

*United States v. Andre Williams*,
    19-cr-782 (RA)............................................................................................................26

*United States v. Aracena de Jesus*,
    20 Cr. 19 (S.D.N.Y. July 1, 2020) .............................................................................25

*United States v. Barton*,
    76 F.3d 499 (2d Cir. 1996)..........................................................................................28

*United States v. Blake*,
    89 F. Supp. 2d 328 (E.D.N.Y. 2000) .....................................................................28, 29

*United States v. Carrasco*,
    313 F.3d 750 (2d Cir. 2002).........................................................................................27

*United States v. Casillas*,
    19-cr-863 (VSB) ..........................................................................................................26

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008).....................................................................................15, 17

*United States v. Colon*,
    15 Cr. 317 (E.D.N.Y. Nov. 20, 2020) .........................................................................25

*United States v. Core*,
    125 F.3d 74-75 (2d Cir. 1997) .....................................................................................29

*United States v. Crosby*,
397 F.3d 103 (2d Cir. 2005),
*abrogated on other grounds by*
*United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005) ....................................................16, 17

*United States v. de Jesus*,
20-cr-19 (S.D.N.Y.) ...........................................................................................................25

*United States v. DeJesus*,
75 F. Supp. 2d 141 ( S.D.N.Y. 1999).................................................................................27

*United States v. Edwin Gonzalez*,
19-cr-708 (AKH) ...............................................................................................................26

*United States v. Espinal*,
19 Cr. 622 (S.D.N.Y. Aug. 6, 2020) (Cote, J.) ..................................................................25

*United States v. Fajardo*,
03-cr-156-04, 2006 WL 3498640 (S.D.N.Y. Dec. 5, 2006), *aff'd sub nom.*
*United States v. Montero Fajardo*, 259 Fed. Appx. 359 (2d Cir. 2008).............................20

*United States v. Galante*,
111 F.3d 1029 (2d Cir. 1997)............................................................................................19

*United States v. Garcia*,
19 Cr. 593 (S.D.N.Y. Dec. 3, 2020)...................................................................................25

*United States v. Hector Rivera*,
16-cr-66 (AT) ....................................................................................................................26

*United States v. Jones*,
531 F.3d 163 (2d Cir. 2008)........................................................................................16, 17

*United States v. Juan Carlos Aracena de Jesus*,
20-cr-19 (PEA)..................................................................................................................26

*United States v. Londono*,
76 F.3d 33 (2d 14 Cir. 1996) ............................................................................................19

*United States v. Mishoe*,
241 F.3d 214 (2d Cir. 2001)..............................................................................................27

*United States v. Morgan*,
19-cr-209 (RMB) ..............................................................................................................26

*United States v. Munoz-Nava*,
524 F.3d 1137 (10th Cir. 2008) ........................................................................................18

*United States v. Nunez*,
   19 Cr. 691 (S.D.N.Y. May 5, 2021)........................................................................25

*United States v. Rodriguez*,
   19 Cr. 817 (S.D.N.Y. Oct. 6, 2020) ......................................................................25

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009)....................................................................................15

*United States v. Trantham*,
   2007 WL 3274906 (E.D.N.Y. Oct 30, 2007).........................................................27

*United States v. Williams*,
   65 F.3d 301 (2d Cir. 1995)....................................................................................29

*United States v. Wong*,
   40 F.3d 1347 (2d Cir. 1994)..................................................................................28

**Statutes**

18 U.S.C. § 3553(a) .................................................................................................. *passim*

18 U.S.C. § 3553(a)(2)....................................................................................................31

18 U.S.C. § 3553(a)(2)(a).................................................................................................18

18 U.S.C. § 3553(a)(2)(B)................................................................................................31

18 U.S.C. § 3553(a)(2)(C)................................................................................................31

U.S.S.G. § 4A1.3 .............................................................................................................27

*"Charles has made some mistakes and also some bad decisions in his young life. But I have seen a tremendous change in him since he's been incarcerated, the time he has been away from his family and having time to think has made him reevaluate his life."*

Letter of Clarence Reese, attached as Exhibit A.

## PRELIMINARY STATEMENT

Mr. Evans respectfully submits this memorandum for the Court's consideration in advance of his sentencing.

Charles Evans has lived a difficult and tumultuous life. Sometimes the wounds he experienced were beyond his control, and sometimes they were self-inflicted. As the Court will see, Mr. Evans had virtually no relationship with his biological father, lived in and out of shelters for years, lost the one positive male role model he had in his life, and fears that he is becoming that which he despised, an absentee father.

Charles Evans is a young man who sees the error of his ways and wishes to put his past behind him. Most of his transgressions were from his teenage years. He was young and impetuous and made mistakes. Mr. Evans knows this. He also recognizes that the conduct that brings him before the Court for sentencing was a grave error. Although he never fired, brandished, or intended to use the gun he carried for protection, he understands that his actions were wrong and has accepted responsibility for them. As a result of his error in judgment, Mr. Evans has already served just over two years while awaiting the final disposition of this matter. Due to the COVID-19 pandemic, he has served these two years in the most inhumane and difficult circumstances in recent history.

Mr. Evans seeks a sentence of time served. The reasons are numerous. The conditions at his various jails were unrelentingly harsh. He has a son, recently diagnosed with ███, who

1

needs him.  His mother, who suffers from a ███████████████, also needs him.  He has made efforts at post-offense rehabilitation, and he has learned his lesson about following the law and living a productive life.  Thus, Charles Evans, and his family and friends, respectfully ask this Court to impose a sentence of time served so that Charles can continue to move away from his past and toward a future he hopes to build for himself.

## BACKGROUND AND PROCEDURAL HISTORY

### I.   Charles' Personal Background

#### A.  Charles' Childhood and Youth

On ████████, Kareemrokeisha Reese gave birth to her first child, a son, Charles Ramel Evans.[1]  Charles' father, Charles "C.J." Evans Sr., gave his name to the infant and then promptly abandoned him.  He did not leave a phone number or address for Kareemrokeisha, or his son, to contact him.  C.J. never called his young family and did not offer them any support.  During Charles' life, C.J. visited exactly two times.  On both occasions, C.J. appeared suddenly and spent a few hours taking Charles out for lunch and buying him shoes.  C.J. promised to return soon and then, to Charles' great disappointment, C.J. disappeared again.  At a very young age, Charles felt the pain of knowing his father did not care to be in his life.  To this day, Charles does not know the whereabouts of his biological father.  Based on information from relatives, Charles believes that C.J. has had substance abuse issues and has been in and out of jail.

Kareemrokeisha was a single mother with a new born baby.  She and Charles lived with Charles' grandmother, aunt, and uncle in a two-bedroom apartment in Washington Heights, New York.  When Charles was a little over a year old, Kareemrokeisha and Charles moved into a shelter because there was not enough space in the cramped apartment.  While living in the

---

[1] The Court may notice Charles' family and friends call him by his middle name, Ramel.

shelter, Kareemrokeisha met David "Dave" Cooper Sr. and introduced him to Charles. Charles was two years old at the time.

Kareemrokeisha and Charles moved out of the shelter and into an apartment in the Bronx with Dave. The three lived there together for a couple months before Dave decided to live with his mother. About this time, Kareemrokeisha and Dave had one child together, David Cooper, Jr. ("David Jr."). Kareemrokeisha, Charles, and his little brother lived in the Bronx for approximately five years. [2]

Dave was like a big brother to Charles as he was growing up. He lived with his mother down the street from Charles' grandmother in Harlem. [3] The close proximity allowed Charles and David Jr. to maintain a relationship with Dave. Charles frequently stopped by Dave's home and talked to Dave. Dave was a source of emotional support for Charles. Charles loved Dave, but he saw the even stronger bond between Dave and David Jr. This repeatedly caused Charles pain knowing that his own father had abandoned him.

Charles attended elementary school in the Bronx, but he remembers visiting his grandmother almost every day in Harlem. His grandmother packed the children's backpacks with food for the week. Charles' family had little money for basic necessities, and Kareemrokeisha relied on public assistance for food, housing, and other services. Kareemrokeisha tried her best to ensure her children were fed, bathed, and ready for school each morning. Charles remembers his mother being his "mom and dad" because of all the work she did for her family.

---

[2] Several years later, Kareemrokeisha had a daughter fathered by a third man. Kareemrokeisha then had two sons with a fourth man named Clarence Reese. Charles has a total of four siblings: David Jr., Destiny, Zion, and ███.
[3] Dave was disabled as the result of a gunshot wound. He required a walker and was generally housebound.

Once, when he was approximately 10 years old, Charles' mother told him, "Ramel, go see who is downstairs for you." At the bottom of the stairs, Charles saw a man that looked just like him. Charles knew right away that it must be C.J., his biological father. It was the first time Charles could remember meeting his dad. That night, C.J. took Charles for Chinese food. C.J. promised Charles, "I'm going to be back tomorrow." Charles knew it was too good to be true, and it was. Charles would not see his father again for approximately five more years.[4]

After a few years, Kareemrokeisha decided to move closer to Charles' grandmother in Harlem. His family was transferred to an area nicknamed the "Polo Grounds". It was a rough area where safety and security were an illusion. As Charles entered middle school, his aunt told him, "Ramel, you better learn how to fight and not be scared." Virtually all of Charles' peers were engaging in street fighting. He was overwhelmed by the physically dangerous situations surrounding him.

As Charles grew older, he and his friends began engaging in fights more frequently and smoking marijuana. His mother grew worried as she learned from others what he was doing on the streets. Thus, in 2009, Kareemrokeisha relocated to Houston, Texas with her children to try to provide a safer upbringing.

The whole family moved to Houston together. By this time, Charles had a little sister, Destiny Hall, and another little brother, Zion Reese, who was born with a ███████████ ████████████ known as ██████████████████████████. Kareemrokeisha chose Houston because the father of her son Zion, Clarence Reese, had moved to Houston.

While Kareemrokeisha was pregnant with Zion, she learned that he had ██████. The left side of Zion's heart was formed too small to properly pump blood. Zion was born prematurely,

---

[4] Charles remembers meeting his father in person only one other time. Charles was approximately fifteen years old.

two days after the discovery, on October 23, 2007.  During the first week of his life, Zion required his first of many heart surgeries.

Zion had follow-up heart surgery approximately three years later which required him to use a pacemaker and a feeding tube for six months.  After the family moved to Houston, doctors removed Zion's pacemaker and he stopped using the feeding tube.  Zion survived without these aids for several years, until his heart failed.

Things were fine in Houston for a while.  However, soon Charles began to miss his friends in New York.  His siblings were likewise homesick.  The children constantly pestered their mother about moving back to the city.  Kareemrokeisha rejected the idea of going back to New York.  She heard from her mother, Grandma Pat, that Charles' old friends in New York were involved in robberies and had other problems with the law.

Clarence and Kareemrokeisha were married in 2010.  At approximately the same time, Zion required an extended stay in the hospital due to his heart condition.  Kareemrokeisha was overwhelmed and hesitantly agreed to allow her sister, Iyanna, to take Charles, David Jr., and Destiny back to New York as she and Clarence stayed with Zion in the hospital in Houston. Ultimately, Kareemrokeisha also decided to relocate back to New York where her family lived.

Upon his return, Charles fell into old habits quickly.  He spent the summer with his old friends smoking, drinking, and fighting.  By the end of the summer, Kareemrokeisha, Clarence, and Zion had returned to New York.  Charles and his family moved back into a shelter.  He was back in New York but also back to his previous problems.

### B.  Charles is Arrested for Robbery at 16 Years Old

On October 12, 2010, when he was just sixteen years old, Charles and his friends took part in a robbery.  Charles and his friends approached an individual outside a clothing store in the

Bronx and demanded money. Charles threatened the individual with a knife. The boys got away with $10 dollars. No one was physically injured. The next day, the individual identified Charles and police arrested Charles.

Charles' youthful offenses did not stop with the robbery. On September 26, 2011, Charles was arrested for an attempted hate crime/assault with intent to cause serious physical injury in the third degree. Four days earlier, on September 22, 2011, Charles and his friends saw a transgendered women inside a store and told her to leave. Charles, his friends, and the transgendered woman exited the store and continued to argue on the street. The teenagers yelled slurs at the transgendered woman and threw bottles at her as she stood across the street from them. No one was physically injured during the incident.

On March 23, 2012, Charles pled guilty and was sentenced in New York County Supreme Court for robbery in the first degree and for an attempted hate crime/assault with intent to cause injury with a weapon. In approximately September, 2012, pursuant to his plea agreement and after spending a total of twelve months at Rikers Island, Charles was released into a halfway house on Harlem and 147th Street.

Charles tried to get his life back on track. He enrolled at the High School for Excellence and Innovations in Manhattan, the same school he attended before his incarceration. Charles also attended a court-mandated program with a therapist named Katie Boatright. Ms. Boatright came to Charles' grandmother's house and would talk to Charles and his family. They would do therapy exercises together like drawing pictures. Charles loved the program and found it helped him and his family. He graduated and things were starting to look up for Charles.

### C. The Coercion Charge

In or around 2013, Charles' family moved again. This time they moved to Binghamton, New York. The family packed up their possessions in the shelter and moved into a two family house. The six fit themselves into three bedrooms. The rent proved to be too steep. Ultimately, the family moved into a small apartment provided through section 8 housing.

On September 26, 2013, when Charles was approximately 19 years old, he took the bus to New York City to go shopping with a friend. On the bus ride back to Binghamton, Charles fell asleep with his phone on his lap. When he awoke, his phone was missing. Charles turned to the man sitting next to him and asked the man if he had seen Charles' phone. With a smirk on his face, the man said, "No." Charles asked the man again, and this time asked the man to give him his phone back. Charles' brother, David Jr., came over to where Charles and the man were sitting. David Jr., too, asked the man to give Charles' phone back. The man jumped to his feet and ran off the bus. Charles and David Jr. chased the man down the street.

The trio got into a fight. Police officers arrived at the scene and charged Charles and David Jr. with robbery. However, Charles and David Jr. were trying to retrieve Charles' phone from the man. David Jr. insisted that the other man threw the first punch. The police officers released David Jr., but they held Charles after they saw he had previous convictions. The robbery charge was ultimately dropped to a coercion charge; Charles, who was older and had a record, was deemed to have coerced his brother David Jr., who was younger and had no record, into engaging in the fight. In the end, Charles pleaded guilty to coercion in the first degree. His upward momentum had come to a halt.

In April 2014, Charles was sentenced to a year in county jail. He served eight months before being transported to Manhattan. As a result of his new arrest and prior plea agreement, he faced sentencing for the 2010 robbery and the 2011 attempted hate crime/assault. On October

31, 2014, he was sentenced to five years' imprisonment and three years' post-release supervision for the October 2010 robbery in the first degree.  On the same day, he was sentenced to three years' imprisonment and two years' post-release supervision for the September 2011 attempted hate crime/assault.  The sentences ran concurrently.  At nineteen years old, Charles began a five year prison term.

### D.  Zion and Charles' Family Circumstances

In May 2014, during Charles' time in county jail for the coercion charge, his family almost lost Charles' little brother, Zion.  Zion fell ill and doctors placed him on a heart transplant list.  During this period, Kareemrokeisha and her family moved into the Ronald McDonald house.  Charles' brother, David Jr., described the painful and difficult time, "We watched our mother struggle to make ends meet and take care of our younger brother with a heart condition." *See* Letter of David Cooper, attached as Exhibit B.  On July 8, 2014, Zion received his new heart.  He was 7 years old.

The whole family was by Zion's side at the hospital – except Charles.  While incarcerated, Charles learned from afar on his brother's critical condition.  Charles' mother wrote, "During [the time Zion waited for and received his new heart], Charles was very stressed out not knowing if his baby brother was going to make it or not."  *See* Letter of Kareemrokeisha Reese, attached as Exhibit C.

Charles also worried about the women in his family.  Charles' mother has been raped twice.  Both occurred after Charles was born.  As Kareemrokeisha explains, "Charles is very overprotective of the females in his family.  Years ago I was violated not once but twice.  At different times I was raped, so my son is very overprotective."  *See* Letter of Kareemrokeisha Reese, attached as Exhibit C.  As a result of the violence Kareemrokeisha suffered, she was

8

diagnosed with an ███████████ so severe she was left unable to work.  Kareemrokeisha receives disability checks and has difficulty leaving her house.

Charles first learned about the rapes when he overheard his mother and grandmother's conversations.  When Charles was a teenager, Kareemrokeisha tried to explain to him what happened.  Charles was left to process the violence perpetrated against his mother.  Charles held a lot of emotions inside himself to be strong for his family.  As she grows older, Kareemrokeisha needs the comfort and support of her eldest son more each day.

### E.  Charles' Relationship With His Father

When Charles was imprisoned at 19 years old, his biological father, C.J., contacted him for the first time in approximately four years.  C.J. wrote Charles a letter and included a $100 bill inside.  He also wrote his phone number at the end of the letter.  For the first time in his life, Charles had a way of contacting his father.  At one of his lowest points, Charles was glad to finally be able to talk to his biological father.  However, Charles was wary of his father for walking out on him.  And for good reason.  One day, Charles called his father's phone and no one answered.  He tried several more times to reach his father but to no avail.  Charles was not surprised his father had returned just long enough to reopen old wounds.

While in prison, Charles earned a certificate in custodial maintenance.  He also earned a 30-hour certificate with the Occupational Safety and Health Administration.  He completed several anger management programs like A.R.T. and A.S.S.A.T.  The programs helped Charles learn about himself and his emotions.  Charles was paroled on April 23, 2018, after serving most of his five year sentence.  Charles was twenty-three years old when he was released.  With the help of Dave, who Charles turned to for support and guidance, he remained positive and excited for the future.

### F.  Charles is Released on Parole and Immediately Obtains a Job

Once released, Charles began submitting job applications.  He made sure he complied with his parole and ensured he was enrolled in any mandated programs.  Within the first two months, Charles received an invitation to interview at Old Navy.  At 23 years old, Charles had never before interviewed for a job.  Charles received a second interview and, ultimately, the job. He worked in the stockroom earning $300 bi-weekly.

Soon after Charles started working, disaster struck.  The only father figure he ever knew, Dave, suddenly died.  Charles was working when his mother called.  "Ramel, Dave just died," she said.  Charles felt as if the room around him had gone blank.  He felt like he was going to pass out.  Charles went to his manager and quickly told them what had happened.  He cried the entire train ride home.

Charles did not see Dave's death coming.  Although Dave had been in the hospital receiving treatment for skin cancer, Dave never informed Charles, or his brother David Jr., of the full extent of his deteriorating health.  In fact, Charles and his mother were scheduled to see Dave that week.  When Charles called Dave to tell him, Dave had only said, "Okay, cool."

Charles felt lost after Dave died.  He felt anger, too.  Charles responded by smoking marijuana and walking around Dyckman for hours.  He felt, somehow, he might find Dave on those long walks through the city.  Charles saved Dave's old text messages.  He reread them for comfort.  He would call Dave's phone just to hear Dave's voice on the voicemail.

### G.  Charles Becomes a Father

A few months after Dave's death, Charles met a young women named Erika Leon. Charles felt Erika was the blessing God sent him after Dave was taken away.  They fell in love. Then Charles received some shocking news.  His ex-girlfriend, Brandy, told him she was

pregnant.  Charles saw this as an opportunity and, instead of ignoring the situation, he decided to become ready to be a father.

Charles' son, ███ , ████████████   Charles came to believe his son was another blessing from God sent after he lost Dave.  He named his son after Dave.  Charles helped with the baby shower, child birth, feeding, and changing diapers.  He was happy to provide financial assistance for the baby.  Erika, in her letter on behalf of her fiancé, Charles, wrote of him becoming a father, "Charles had a son and I never saw him happier than being a father figure to his son."  *See* Letter of Erika Leon, attached as Exhibit D.

Charles is devastated that he cannot be by his son's side due to his current incarceration.  His baby was four months old when Charles was arrested.  He missed his son's first birthday, first steps, baby teeth growing in, and more.  Doctors recently diagnosed his son with ████ .  This, combined with his incarceration, caused Charles to feel like a failure.  Charles is now comparing himself to his own biological father.  He has become what he hated, an absentee father.  He remembers the pain his father's absence caused him, and he wants to break that cycle and be a positive influence in his son's life.

### H.  Charles Obtains a Job at Butler Painting

Slowly, Charles began to recover from the shock of Dave's death.  Erika encouraged Charles to speak with his parole officer to ask for assistance in finding a new job.  Charles agreed and enrolled in the Center for Employment Opportunities ("C.E.O."), a program that helps find employment for formerly incarcerated individuals.  He began cleaning up sides of highways and court buildings approximately three days per week.  He earned $80 per day.

Through the C.E.O. program, Charles landed a job at a Butler Painting Co.  He earned approximately $690 per week.  Charles and his employer, Mike Butler, hit it off right away.

Charles impressed Mike by showing positivity and motivation.  In his letter on behalf of Charles, Mike wrote, "I had a number of employees from the program some don't last a week, some last a month, only 1 other candidate lasted as long as Charles.  Charles has been a dependable on time employee.  When given a task and a time frame he does his best to achieve it.  He brings a positive attitude and some laughs to the workplace."  *See* Letter of Mike Butler, attached as Exhibit E.  Charles worked at Butler Painting for approximately nine months in 2019 before his arrest.

At times, Charles sought Mike out as a mentor and the two discussed Charles' life.  Mike further wrote, "After Charles became a proud father we had a conversation about some other ideas he had about his future and how he could become more financially independent, we discussed some of his ideas to get a startup business."  *See* Letter of Mike Butler, attached as Exhibit E.  Charles admitted to Mike that he struggled to find a place to sleep each night.  Despite this challenge, Mike never had an issue with Charles coming in for work.  Mike is willing to offer Charles his painting job back after he is released because Charles is a great employee.[5]  Charles' motivation and work ethic will ensure he is quickly and gainfully employed upon his release.

### I.   Charles' Relationship With Family After His Release

Not only is Charles a dedicated father, he is a loving big brother to his four siblings.  His mother struggles to care for the family.  When Charles came home, he assisted in taking care of his younger siblings.  He helped his mother take care of the children, provided financial support

---

[5] While Mr. Butler has confirmed that he is willing to hire Mr. Evans again in the future, Mr. Butler can only do so if his business requires painting contractors at that time. For instance, Mr. Butler noted that the painting business is slow in the winter months and at the present time he would not be able to guarantee employment.

to his family, gave advice to his siblings, and acted as a peacemaker in the home to help avoid arguments.[6]

Charles also tried to assist his brother when David Jr. was in prison.  Charles sent money to his incarcerated brother and to David Jr.'s young family.  David Jr. wrote on behalf of his brother, "Charles helped babysit and provide for my daughter, he helped with homework, taught her how to cook and read, write, etc."  *See* Letter of David Cooper, attached as Exhibit B.  David Jr. wrote, "My brother is my biggest role model because he is a strong man mentally."

**II.     Relevant Facts Concerning the Offense Conduct**

Charles struggled to find housing after he received parole.  His grandmother did not have room for him in her small apartment because Charles' aunt and uncle lived with her.  Charles' mother lived in a shelter.  His mother attempted to sneak Charles in some nights so that he had a place to sleep.  On one such occasion, the security guard caught her bringing Charles inside.  They told her he must leave or else they would report her which would have placed his family's housing at risk.  It hurt Charles to see his mother in a difficult position.  Charles said to his mother, "I'm good.  I promise.  Go in there and get some sleep."  That night, Charles did not sleep.  He walked around Dykman until the sun came up.

Charles has faced homelessness on and off throughout his life because his family has always struggled to obtain stable housing.  When he received parole, his family had been living in a shelter for two years.  They were very close to coming off the waitlist for a four bedroom apartment provided by the public housing system.  While his family waited in the shelter, Charles was never certain where he would lay his head at night.  Finally, his mother heard good

---

[6] Charles' grandmother created a petition attesting to Charles' character and reliability.  Thirty-four friends and family signed the petition.  *See* Petition dated November 10, 2020, attached as Exhibit F.

news.  She received a voucher for a four bedroom apartment.  However, the apartment was located in the ████████████████ .

Kareemrokeisha wanted to help her son get off the streets.  She told Charles he should take one of the four bedrooms.  Charles remembered how his mother had been thrown out of her apartment in Binghamton because of his brother, David Jr.  He did not want to put his mother's housing at risk, and Charles worried that he might be in trouble, too, if he lived in the ████ ████ .

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████

The relocation did not help Charles.  Indeed, he became a target and started to receive death threats.  Charles feared that any trouble with these individuals could lead to his mother losing her public housing.

Yet, Charles was in dire need of housing and had no other options.  He was not willing to live with his mother if he felt he placed her housing at risk.  Then Charles made the serious error in judgment that brings him before this Court.  Charles believed that if he carried a gun, no one would attempt to harm him or his family.  Charles did not buy the gun to commit a crime or use it offensively.  Nevertheless, he purchased a weapon.[7]

On the night of February 7, 2020, at approximately 10:30 p.m., Charles walked his sister to the train station to ensure her safety.  As they crossed ████████████████ in the

---

[7] Charles has had several years to reflect on his decision, and he knows it was the wrong one.  He offers this information not as an excuse, but so the Court will understand his motivation for carrying the weapon.

███, three police officers saw Charles and his sister.  Charles noticed the plain clothed police officers who seemed interested in him.  Charles moved to a nearby car and placed the gun beside it.  Charles walked away from the car and the gun.  The officers exited their vehicle and, with a flashlight, examined the area where they had seen Charles behind the car.  The officers noticed a black firearm in the location Charles had been a few minutes earlier.  They followed Charles and apprehended him.

Charles knows he made a mistake in carrying a gun and trying to dispose of it.  The gun he had obtained to protect himself and his family had only brought him more trouble.

**SENTENCING ANALYSIS**

Section 3553(a) of Title 18 of the United States Code provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."  18 U.S.C. §3553(a);  *see also United States v. Stewart*, 590 F.3d 93, n.17 (2d Cir. 2009).  As the Court well knows, it has "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime."  *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*).

The Court must calculate the United States Federal Sentencing Guidelines (the "Guidelines") before imposing a sentence, but is not obligated to impose a sentence consistent therewith.  "The Guidelines are guidelines—that is, they are truly advisory" and "a district court may not presume that a Guidelines sentence is reasonable."  *Id*. at 189.  The Guidelines merely come into play as one among many factors contemplated under §3553(a).  In considering the §3553(a) factors, the Court should give no greater weight to the Guidelines calculation than any of the other factors.  *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *see also Simon v. United States*, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005).  Indeed, the Court "must make an

individualized assessment of the sentence warranted by Section 3553(a) based on the facts presented." *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (internal quotations omitted).  Thus, the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  "Underlying this tradition is the principle that the punishment must fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 477 (2011) (internal citations omitted).  After considering all of the §3553(a) factors, the Court should decide whether to "impose . . . a sentence within the applicable Guidelines range or within permissible departure authority," or "to impose a non-Guidelines sentence." *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005), *abrogated on other grounds by United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005).  It is thus appropriate for courts to sentence defendants below the Guidelines range when such a sentence satisfies the purposes of 18 U.S.C. § 3553(a).  For the reasons stated below, Mr. Evans respectfully requests that this Court impose a non-Guidelines sentence in this case.

## I.    The Guidelines Calculation

### A.  The Applicable Offense Level and Criminal History Category Under the Guidelines

The Court must calculate Mr. Evans' Guidelines range and his criminal history category ("CHC") as a part of sentencing.  Mr. Evans does not object to the Presentence Investigation Report's calculation of the guidelines.  The total applicable offense level is 21 under the Guidelines.  Similarly, Mr. Evans does not object to the calculation of Mr. Evans' CHC under the Guidelines.  The analysis of the sentencing range places Mr. Evans in a CHC of V, with a sentencing range of 70 to 87 months.

Mr. Evans respectfully submits that the CHC substantially overstates the seriousness of his criminal history, and that a careful review of the relevant §3553(a) factors weighs in favor of a non-Guidelines sentence in this case.

## II.     Factors to be Considered Under 18 U.S.C. §3553(a)

In addition to the Guidelines, the Court must consider the following §3553(a) factors:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law, and to provide punishment for the offense, (b) to afford adequate deterrence to criminal conduct, and (c) to protect the public from further crimes of the defendant; (3) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution.  *See* 18 U.S.C. §3553(a); *Cavera*, 550 F.3d at 189; *see also United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).

The Court can use any individual factor it deems compelling to justify a downward variance that results in leniency for a defendant.  In contemplating the §3553(a) factors, the Court must arrive at a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. §3553(a); *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007).  Neither the nature nor circumstances of the offense nor the history and characteristics of the defendant need be extraordinary to justify a deviation from the advisory Guidelines range.  *See id*. at 594-95 ("We reject . . . an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range."); *see also United States v. Jones*, 531 F.3d 163, 171 (2d Cir. 2008) ("In reviewing a district court's explanation of a sentence for reasonableness at either the procedural or substantive step of

17

analysis, *Gall* holds that an appellate court may not demand 'extraordinary' circumstances to justify non-Guidelines sentences.").  Indeed, downward variances may be based on factors that are "disfavored" under the Guidelines, even in the absence of extraordinary circumstances.  *See United States v. Munoz-Nava*, 524 F.3d 1137, 1148 (10th Cir. 2008).

An analysis of the §3553(a) factors demonstrate that Mr. Evans' situation is one that warrants leniency.  Addressing the relevant §3553(a) factors in turn, Mr. Evans submits that his circumstances warrant a non-Guidelines sentence for four principal reasons:  (1) Mr. Evans' family circumstances, including missing two years of time with his newborn child, (2) Mr. Evans has endured brutal conditions while incarcerated during the COVID-19 pandemic, (3) his criminal history category substantially overstates the seriousness of his criminal history; and (4) pursuant to §3553(a)(2)(a), Mr. Evans has demonstrated real efforts at post-offense rehabilitation.

## A.  Mr. Evans' Personal History and Characteristics

Throughout his life, Mr. Evans has faced many obstacles.  Despite this, Mr. Evans is a positive and hardworking young man who tries to put his family first.  As a result, the Court should take his life, and the difficulties he has faced, into account when fashioning an appropriate sentence.

### i.   Mr. Evans' Family Circumstances Warrant a Non-Guidelines Sentence

Mr. Evans' family needs him.  His mother struggles financially and emotionally, and his baby's mother is caring for their special needs child alone.

Mr. Evans' son suffers from developmental delays.  Brandy, the baby's mother, sought help for ▮▮ when she felt something might be wrong.  ▮▮ would not respond to his name, walked on his tippy toes, flapped his hands, and spun around in circles.  After Brandy took ▮▮

18

to be evaluated, she learned these were all early signs of ████. ████ now has an early childhood development therapist that visits him at home. Brandy updates Mr. Evans about their son's progress. ████ is two years old, but his therapist stated ████ is currently at the developmental stage of an 11-month-old. With the help of his therapist, ████ has learned to sort mixed toys, listen to commands, and point at objects. It is only a start, but ████ has shown signs of communication.

With his new diagnosis, ████ will require even more assistance than an average child during this critical stage of development. Though Brandy is grateful ████ is receiving the therapy he needs, she described the experience as a great deal of work. Brandy is currently unemployed caring for their baby. ████'s diagnosis and needs weigh heavily on Mr. Evans' mind. In his absence, Kareemrokeisha gives her own money to his son's mother to provide for the baby and maintain a good relationship for the future. However, this is not sustainable. Kareemrokeisha receives a fixed income as a result of her disability. The checks she receives are not enough to care for her own children, three of whom still live with her, including her 6-year-old son. His family needs him, and Mr. Evans has already shown his commitment to being there for them upon his release.

Mr. Evans respectfully requests that the Court consider the undue impact on his young son in imposing a sentence. To be clear this is not a motion for a downward departure under the Guidelines, however, those cases are instructive for why a variant is warranted here. *See, e.g., United States v. Galante*, 111 F.3d 1029, 1034-5 (2d Cir. 1997) (affirming downward departure where "removal of the father from this unit at this particular point in time would have a disastrous effect on the [8 and 9 year old] children in terms of possibilities of their education and upbringing" and acknowledging "it is the families of defendants that are the intended

beneficiaries of downward departures" for family circumstances); *United States v. Londono*, 76 F.3d 33, 36 (2d 14 Cir. 1996) ("this Court and other courts of appeals have recognized that a defendant's familial responsibilities may present such 'extraordinary circumstances' that a downward departure in sentencing is necessary and permissible").  The reasoning of these cases supports a non-guidelines sentence below the applicable sentencing range, and Mr. Evans respectfully submits that he should receive a non-guidelines sentence of two years for time served so that he can support his family and son.

### B. COVID-19 Conditions at Rikers Island, Essex County Correctional Facility, and the Metropolitan Detention Center Warrant Leniency

Mr. Evans has been incarcerated since February 7, 2020.  He entered the prison system approximately one month before the onset of the COVID-19 pandemic in early March, 2020. Mr. Evans has spent the majority of his two year incarceration bouncing between partial and full lockdowns.  He has been incarcerated at three different facilities:  approximately five months at Rikers Island ("Rikers"), approximately twelve months at Essex County Correctional Facility ("Essex County"), and approximately eight months at the Metropolitan Detention Center ("MDC").  The conditions are inhumane.  Mr. Evans respectfully submits that leniency is warranted due to the unusually harsh conditions created by the recent lengthy lockdowns at these facilities.

In sentencing Mr. Evans, it is appropriate for this Court to consider the egregious conditions he has been subjected to while incarcerated.  *See United States v. Fajardo*, 03-cr-156-04, 2006 WL 3498640, at *4 (S.D.N.Y. Dec. 5, 2006) (considering the conditions of pre-sentence detention for the purposes of determining the proper sentence when a downward

departure was unavailable), *aff'd sub nom. United States v. Montero Fajardo*, 259 Fed. Appx. 359 (2d Cir. 2008).

On February 7, 2020, Mr. Evans was first incarcerated on Rikers Island. Approximately one month later, Rikers went into full lockdown because of the COVID-19 pandemic. This began a two year period that included denial of showers, exercise, delayed and cold meals, the termination of family and counsel visits, and twenty-four hours a day in a cold, dark cell with no access to information. After approximately five months at Rikers, in July, 2020, Mr. Evans was transported to Essex County in Newark, New Jersey.

Essex County was on full lockdown when Mr. Evans arrived. Mr. Evans could not see nor speak to his family for weeks at a time. Mr. Evans stated that not being able to speak with family during the pandemic has been extremely difficult because it is his only means of emotional support. Counsel was also not permitted to visit. Amid one such period of restricted communication, prison officials took a flash drive, containing information about his case, away from Mr. Evans. Mr. Evans submitted a complaint to his lieutenant and requested the flash drive be returned. Mr. Evans never received his flash drive or a replacement.

Essex County alternated between tiers of inmates that could leave their cell for recreation, but in fact, Mr. Evans was hardly ever allowed to leave his cell. For the past two years, Mr. Evans cannot remember being outside for fresh air. Essex County constantly remained on lockdown for what prison officials called "RASH". In addition to COVID-19, prison officials used any number of reasons to justify a RASH lockdown. Inmates were told they were on RASH because it was raining outside, or because the prison was short-staffed.

During a RASH, inmates could not leave their cells for any reason. RASH lockdowns were frequent and lasted anywhere from a couple of days to a week. During this time, inmates

were not allowed to shower.  Inmates had to hang up sheets for a semblance of privacy so that

they could wash themselves in the sink.  Meals were delayed and cold, often served two or three

hours late.  During a RASH, inmates were not allowed to speak to their lieutenants or make

formal complaints.  Mr. Evans endured RASH lockdowns at Essex County for approximately

twelve months before being moved to the MDC.

Mr. Evans has been incarcerated at the MDC since July 6, 2021.  Those eight months

have been extremely difficult.  When Mr. Evans arrived at the MDC, they were on full lockdown

and no one could leave their cells.  On or about October, 2021, the MDC experienced a blackout

for approximately two weeks.  There was no electricity.  The cell windows in the MDC are

covered by thick paint.  Mr. Evans reported that he lived in pitch blackness for two weeks.

There was no cooling available, and the cells were swelteringly hot.  Meals were delayed for

hours and served cold in bags.  Serving sizes were inadequate and Mr. Evans reported feeling

starved.  Inmates were given two bottles of water each day because drinking water was not

available.

During the blackout, the toilets in the cells would not flush.  Feces and urine sat in the

toilets.  Mr. Evans and another inmate were locked in their 10' X 10' cell in the dark as the smell

grew unbearable.  They tried to pour soup into the toilet to cover the smell.  Mr. Evans used his

personal shower towel to scrub the toilet.  There were no gloves for protection.  Cleaning

products were kept under lock and key by prison officials and inmates rarely had access.

Inmates were given no information as they sat in their dark cells.  Mr. Evans witnessed

another inmate attempt to speak up for the unit.  Prison officials aggressively pushed him to

floor.  The inmate was sent to the Special Housing Unit, and Mr. Evans never saw him again.

Mr. Evans felt he could not complain after that.  Even if he had wanted to, Mr. Evans would not

have had the means of making a formal complaint because there was no electricity, no computers, and no chance of leaving his cell. Mr. Evans once again had no means of communicating with his family.

Conditions at the MDC have not improved since the blackout Mr. Evans experienced. The conditions that Mr. Evans has endured are unreasonable and undeserved. As the Court likely knows, the MDC has been on a modified or full lockdown for months. Inmates are often limited to 15 minutes per day outside their cells. These 15 minutes are the only time inmates receive to shower, make a phone call to family and respond to messages, or use the computer to obtain information. Even so, Mr. Evans frequently spends 48 hours at a time in his cell without a break.

At the time just before the filing of this memorandum, the inmates at the MDC were on lockdown. Inmates were told this was a result of nationwide lockdowns caused by a gang riot at *another* prison. Showers took more than 72 hours to obtain. Inmates banged on their cells and yelled for access to showers. Inmates chose to go on a hunger strike until they received showers. They denied several meals to receive one 10 minute shower. The situation was impossible to navigate. If an inmate wanted to eat instead of take a shower, that person received backlash from the other inmates for not participating in the hunger strike. The inmates at the MDC are suffering.

More often than not, during the ongoing pandemic, inmates spend virtually 24 hours per day in a 10' X 10' cell with another inmate. It is well-documented that the MDC has struggled to implement safety measures in response to the COVID-19 pandemic. The inmates have suffered as a result. Inmates are denied basic sanitation supplies in their efforts to remain COVID-19-free. At one point, Mr. Evans requested a mask to protect himself from COVID-19.

It took two weeks for him to receive one.  He has been using the same mask for the past month.

Mr. Evans has been tested only twice for COVID-19 during his eight months at the MDC.  On or

about December 24, 2021, Mr. Evans became very sick for approximately five days.  He

received no care during this time.  He received a COVID-19 test only after his symptoms

subsided.  He tested negative.  However, eleven other inmates near his cell tested positive.

Inmates lack other basic necessities.  They rarely have toilet paper.  Mr. Evans has been

forced to clean his toilet and sink with his body soap because basic supplies are scarce.  He only

has his shower towel for scrubbing the toilet and sink.  On one occasion, the inmate with whom

he shares a cell used Mr. Evans' blanket to clean up after the toilet flooded.

The toilets at the MDC are constantly flooding.  Water flows into the cells and covers the

floor.  Inmates are given mops and told to clean it themselves.  Disinfectant is not available to

sanitize the floors.  The best the inmates can do is disperse the water with the mop so that the

floor dries faster.

Mr. Evans' job as an orderly at the MDC is often suspended because of lockdowns.

Inmates wear the same dirty clothes for days at a time.  Inmates wash clothes in the sink with

their body soap.  Some inmates, such as elderly inmates, rely on orderlies like Mr. Evans to wash

their clothes.  Until approximately January 24, 2022, the MDC did not have a working washing

machine.  If orderlies were allowed to work, they had to scrub soapy and dirty clothes by hand

after the clothes came out of the broken washer.

Inmates receive very few hot meals, if any, and frequently the food is moldy or expired.

Breakfast is delivered late and in miniscule portions.  Lunch and dinner are usually cold, bagged

meals.  Mr. Evans reports feeling hungry throughout the day.  During the frequent lockdowns,

commissary services are suspended so inmates cannot buy additional food to stave off hunger.

Food is served on the same carts that are used to dispose of garbage.  These "multipurpose" carts are not sanitized between uses.  There are flies and gnats in the cells.  Inmates also report rats in the special housing units.  The conditions at the MDC are more unsanitary and harsher than in recent years.

Specifically, to Mr. Evans, he has been denied basic, reasonable treatment.  As the Honorable Paul A. Engelmayer recently stated after reflecting upon a defendant's experience at the MCC during the COVID-19 pandemic, "Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close."  *United States v. de Jesus*, 20-cr-19 (S.D.N.Y.), July 1, 2020 Sentencing Tr., 36:16-18.

Due to these unusually harsh and unsanitary conditions, numerous courts in the Southern District have granted downward variances at sentencing.  *See United States v. Nunez*, 19 Cr. 691 (S.D.N.Y. May 5, 2021) (McMahon, J.) (sentencing a narcotics conspiracy defendant to time served instead of the recommended 46 to 57 months because the defendant had already spent 18 months incarcerated at the MDC under "terrible" conditions during the pandemic); *United States v. Garcia*, 19 Cr. 593 (S.D.N.Y. Dec. 3, 2020) (Crotty, J.) (imposing 48-month sentence where bottom of guidelines range was 110 months); *United States v. Colon*, 15 Cr. 317 (E.D.N.Y. Nov. 20, 2020) (Brodie, J.) (imposing 18 months, consecutive to defendant's 18-month state sentence, where bottom of guidelines was 100 months); *United States v. Rodriguez*, 19 Cr. 817 (S.D.N.Y. Oct. 6, 2020) (Kaplan, J.) (sentencing a narcotics conspiracy defendant with three prior drug felonies to time served because of the "very unusual and very harsh" conditions at the MDC during the pandemic); *United States v. Espinal*, 19 Cr. 622 (S.D.N.Y. Aug. 6, 2020) (Cote, J.) (imposing a downward variance "principally because of the conditions of confinement [at the MDC] that the defendant ha[d] [and would continue to] suffer due to the COVID-19

pandemic"); *United States v. Aracena de Jesus*, 20 Cr. 19 (S.D.N.Y. July 1, 2020) (Engelmayer, J.) (imposing a substantial downward variance in part because of "the hard nature of the time [the defendant] has served in the MCC during the coronavirus pandemic"); *Carillo-Berber*, 18 Cr. 703 (S.D.N.Y. June 11, 2020) (Crotty, J.) (sentencing a narcotics conspiracy defendant to time served instead of the recommended 46-57 months due to conditions at the MDC during COVID-19); *Morgan*, 19 Cr. 209 (S.D.N.Y. May 5, 2020) (Berman, J.) (imposing a downward variance after considering "the conditions of the MDC . . . particularly during this difficult coronavirus time, but also across the board even before the coronavirus erupted").  *See* also *United States v. Juan Carlos Aracena de Jesus*, 20-cr-19 (PEA) (imposing a "substantially downward variance" in large part due to the "dreadful" conditions at the MCC during the COVID-19 pandemic); *United States v. Hector Rivera*, 16-cr-66 (AT) (recognizing that three months during COVID-19 is different than three months in normal times); *United States v. Andre Williams*, 19-cr-782 (RA) (imposing a lighter sentence in part due to the pre-sentence conditions of confinement at the MCC); *United States v. Morgan*, 19-cr-209 (RMB) (discussing the substandard conditions of confinement at both the MCC and MDC and sentencing defendant to time served in part due to the conditions at the MDC); *United States v. Casillas*, 19-cr-863 (VSB) (reducing length of sentence in part based on conditions at MCC during COVID-19 crisis); *United States v. Edwin Gonzalez*, 19-cr-708 (AKH) (granting downward variance in part due to the conditions at the MCC during the COVID-19 pandemic).  Mr. Evans respectfully asks this Court to take the substandard conditions of Rikers, Essex County, and the MDC into account when fashioning an appropriate sentence in this matter.

### C.  Mr. Evans' Criminal History Category Overstates the Seriousness of his Criminal History

Mr. Evans' stipulated CHC is a level V.  Mr. Evans does not contest the calculation. However, in fashioning an appropriate sentence, he asks that the Court consider that Mr. Evans' criminal history category overstates his criminal history.

Courts are permitted to consider the nature of the defendant's criminal history in imposing sentence.  Mr. Evans is not asking for a departure of the stipulated criminal history category.  Nevertheless, the cases that discuss that provision of the guidelines are instructive, and the Court can and should consider this as a reason for a variance pursuant to its broad discretion under Section 3553(a).  *See United States v. Mishoe*, 241 F.3d 214, 219 (2d Cir. 2001) (holding that, "the Court would be entitled on remand to consider whether to make a departure based on an individualized consideration of factors relevant to an assessment of whether [the defendant's criminal history category] 'significantly over-represents the seriousness of [the] defendant's criminal history or the likelihood that the defendant will commit further crimes."  U.S.S.G. § 4A1.3."); *United States v. Carrasco*, 313 F.3d 750, 757 (2d Cir. 2002) ("This type of departure [pursuant to section 4A1.3] is most frequently used when a series of minor offenses, often committed many years before the instant offense, results in a [Criminal History Category] that overstates the seriousness of the defendant's prior record.").  *See also United States v. Trantham*, 2007 WL 3274906, *1 (E.D.N.Y. Oct 30, 2007) ("criminal history category was calculated to be II, not III, in view of the defendant's youth at the time of the prior convictions"); *United States v. DeJesus*, 75 F. Supp. 2d 141, 144 (S.D.N.Y. 1999) (departing downward and noting some of the criminal conduct was before the defendant turned 21).

Mr. Evans committed this instant offense while on parole for his convictions from over a decade ago, for offenses committed in 2010 and 2011, when he was approximately 16 years old. While Mr. Evans takes responsibility for his past conduct, at just 16 years old, his actions were in

part a result of a lack of maturity, increased vulnerability to peer pressure, and an inability to fully comprehend the long-standing consequences of his actions. *See, e.g., Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, Journal of Adolescent Health (2009) (noting that studies indicate that brain development continues well into a person's twenties). Mr. Evans has recognized his actions were wrong and he has served time for these convictions.

Thus, Mr. Evans asks the Court to consider Mr. Evans' young age at the time of his prior offenses and the passage of time since those prior offenses. His criminal history as a youth nearly a decade ago over-inflates the Guidelines range and, thus, the recommended punishment for the conduct to which Mr. Evans pleaded guilty. Simply put, Mr. Evans' conduct does not warrant a sentence within 70 to 87 months.

Accordingly, Mr. Evans respectfully requests leniency and for the Court to exercise its discretion and grant a variance due to the overstated nature of Mr. Evans' criminal history category.

### D.  Mr. Evans' Efforts at Post-Offense Rehabilitation

While incarcerated, Mr. Evans has demonstrated significant steps towards post-offense rehabilitation. As the Court well knows, it can take post-offense and/or potential for rehabilitation into account at sentencing. "[I]t is well established that a district court should consider a defendant's potential for rehabilitation in determining a sentence." *United States v. Wong*, 40 F.3d 1347, 1382 (2d Cir. 1994); *see also United States v. Barton*, 76 F.3d 499, 503 (2d Cir. 1996) ("A court may depart from the applicable guideline range in view of the defendant's efforts toward rehabilitation."). Courts in the Second Circuit have granted substantial leniency based on post-offense rehabilitation. In *United States v. Blake*, 89 F. Supp. 2d 328 (E.D.N.Y. 2000), the court departed 21 levels, at least in part, "based upon significant pre-sentence

28

rehabilitation and the probability of continuing steps toward permanent good behavior." *Id.* at 339 (citing *United States v. Core*, 125 F.3d 74-75 (2d Cir. 1997); *see also United States v. Williams*, 65 F.3d 301, 306 (2d Cir. 1995). Charles Evans is a young man worthy of similar consideration.

Mr. Evans is not suggesting to the Court that his efforts militate in favor of a *Blake*-like 21-level departure. However, the below-described efforts are worthy of consideration because he has made efforts to change his life and hopes to continue down this path upon his release. While the pandemic has stifled certain aspects of inmate rehabilitation, Mr. Evans' efforts demonstrate awareness of his circumstances and a serious desire to turn his life around.

First and foremost, he recognizes that he has made a significant error in judgment. Mr. Evans has acknowledged the seriousness of this offense and has expressed remorse for his conduct. By pleading guilty, Mr. Evans demonstrated to the Court that he takes responsibility for his actions.

Mr. Evans has made other efforts that demonstrate post-offense rehabilitation. Mr. Evans has maintained his relationship with his previous employer, Mike Butler at Butler Painting Co., to increase his chances of immediate employment upon his release.

Mr. Evans has made other strides toward post-offense rehabilitation. These steps are born from a desire to get his life back on the right path. Rehabilitation opportunities are severely limited for incarcerated individuals during the COVID-19 pandemic, but Mr. Evans has taken advantage of what is available. He works as an orderly and washes laundry for other inmates. Since his arrest in February 2020, Mr. Evans has taken advantage of educational services. He

voluntarily takes therapy-related classes and has received certificates of completion for each.[8] Mr. Evans sought out these classes to help him cope with stress and the uncertainty in his life. This too is a good indication of his efforts at post-offense rehabilitation.  Mr. Evans is actively trying to prepare to lead a productive life upon his release.  Thus, Mr. Evans respectfully requests that the Court consider his efforts to maintain good mental health as it considers the appropriate sentence in this matter.

Another indication that Mr. Evans is working at his rehabilitation is that Mr. Evans acknowledges the error of his ways.  Perhaps more importantly, he sees a way forward.  He has spent much of the past two years thinking about his past problems and how to avoid them in the future.  Mr. Evans is determined to put his life back on track and be there for his son.  Mr. Evans has made plans for realistic housing options upon his release.  He and his fiancé, Erika, will obtain housing outside of the ███████████████.  Being removed from the physical environment where he committed the offense for which he is being sentenced, and establishing a new life elsewhere, will benefit Mr. Evans.

Mr. Evans respectfully requests leniency because he believes that he can stand on his own two feet.  He believes that he has the ability to achieve a financially-independent, productive, and law abiding life once released.  His recent choices indicate that he is ready for such an opportunity and will make the most of it.

### E.  General and Specific Deterrence

The second factor listed in 18 U.S.C. § 3553(a)(2) is to "afford adequate deterrence from criminal conduct." 18 U.S.C. § 3553(a)(2)(B).  Mr. Evans respectfully submits that imposing a

---

[8] Mr. Evans' certificates include:  Self Help:  Lessons Learned, Self Help:  Anger Management, Self Help:  My Recovery Song, and Century Recreation and Leisure Course.  As a result of the COVID-19 pandemic conditions, Mr. Evans was unable to give defense counsel copies of his earned certificates to attach as exhibits.

sentence that applies the maximum allowable leniency will provide adequate *general* deterrence to similar criminal conduct by others.

Mr. Evans is already a cautionary tale for parolees who consider running afoul of the law after they are released. To the extent general deterrence exists in cases such as this, its goals are served by a short period of incarceration for Mr. Evans. He has served two years in the worst conditions in recent years at the BOP. General deterrence is accomplished because other similarly situated defendants can see the consequences suffered by Mr. Evans. An additional period of incarceration, especially a lengthy one, will likely have little or no impact beyond the time he has already served for his transgressions.

The third factor listed in 18 U.S.C. § 3553 (a)(2)(C) focuses on specific deterrence when it requires the Court to consider the need "to protect the public from further crimes of the defendant." While it is undeniable that Mr. Evans violated the law by possessing a gun, he has suffered for that error by his two-year incarceration. It is likely that this period of incarceration, and the collateral consequences he has suffered therefrom, will be enough to deter Mr. Evans from committing another crime.

Mr. Evans has a life and family he wants to get back. As the Court doubtless knows, it can be difficult for convicted persons to secure jobs. Mr. Evans worked hard to obtain his employment at Butler Painting Co. and desires to return. Mr. Evans' employment was a positive step for him. That Mr. Evans held a job for the first time in his life at Butler Painting Co. shows he has the potential to change. He is ready to marry his fiancé, Erika. Most of all, Mr. Evans wants to give his son all the love and support he needs.

## CONCLUSION

In light of the foregoing and considering the factors set forth in 18 U.S.C. § 3553(a), a sentence of time served is just and adequate punishment for Charles Evans.  Despite a difficult and troubled youth and the error in judgment that brings him before this Court, Mr. Evans has grown into a positive and motivated young man.  He has handled his incarceration as well as possible considering COVID-19 conditions, participating in therapy, maintaining relationships with friends and family, and focusing on his future.  A two-year sentence would fulfill the goals of sentencing while allowing Mr. Evans to continue working toward becoming a productive member of society once released.

Accordingly, Mr. Evans respectfully requests that the Court sentence him to time served.


Dated:  February 11, 2022

Respectfully submitted,

/s/ Gregory Morvillo
Gregory Morvillo

**MORVILLO PLLC**
90 Broad St
New York NY 10004
646-831-1531

E. Scott Morvillo
**Stroock & Stroock & Lavan LLP**
180 Maiden Lane
New York, NY 10038
Tel.: 212-806-5425


*Attorneys for Defendant Charles Evans*